Filed 11/20/14  P. v. Olivares CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B248543 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA081416) |
| v. | |
| SALVADOR IVAN OLIVARES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Alan B. Honeycutt, Judge.  Affirmed.

Richard C. Neuhoff, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury found defendant Salvador Olivares guilty of one count of first degree murder (Pen. Code, § 187, subd. (a)),[1] and one count of willful, deliberate, and premeditated attempted murder (Pen. Code, §§ 664, subd. (a) & 187, subd. (a)). The jury also found true gang and firearm enhancements as to both crimes (§§ 186.22, subd. (b)(1)(C) & 12022.53, subds. (B)-(D)). On appeal, defendant contends: (1) regular and undercover police officers elicited incriminating statements from him in violation of his Fifth Amendment rights and the trial court erred in denying his motion to suppress those statements; (2) the trial court erred in failing to suppress his involuntary confession in violation of his Fourteenth Amendment right to due process; (3) the evidence was insufficient to support findings that defendant's gang was a "criminal street gang" within the meaning of section 186.22, subdivision (f); and (4) if there was insufficient evidence to support the gang enhancements, firearm enhancements could not be imposed under section 12022.53. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 30, 2011, Jesus Piste-Naal was at a friend's party on Eastwood Avenue in Lennox. Shortly before midnight, Piste-Naal was standing in front of the house at the property where the party was being held. Defendant approached on a scooter. He put the scooter down in front of the house and walked along a driveway to the party at the back of the property. Sergio Gomez was also at the party; defendant approached him. Defendant said he was looking for someone to kill, then he said "Tripas" or "Lennox," and that he was looking for a gang member.[2] Gomez told defendant it was a family party and there were no gang members. Defendant showed Gomez a gun and again said he wanted to kill someone. Gomez told defendant to calm down and leave. He escorted defendant out. Gomez and Piste-Naal saw defendant walk south down Eastwood; Piste-Naal saw defendant turn into a driveway. A few minutes later, Gomez and Piste-Naal

---

[1]    All further statutory references are to the Penal Code unless otherwise referenced.

[2]    At trial, a gang expert testified that "Tripas" is a derogatory name for the "Tepas 13" gang.

2

heard several gunshots. Piste-Naal saw defendant running southbound; Gomez saw someone running but could not tell who the person was.

Just before midnight on April 30, Luis C. was in a house on Eastwood Avenue, across the street from the home of Francisco Roman, who was known as "Little Man." He stepped onto the front porch and saw Roman sitting in the passenger seat of a silver truck. Another man later identified as Francisco Macias was in the driver's seat. Luis saw defendant walk by on the sidewalk in front of the house where he was standing. Defendant was wearing a baseball cap. Luis had seen defendant twice before in the area. Defendant stopped and stared at the truck, then began shooting at it. He moved toward the driver's side of the truck as he shot, then ran away. Roman got out of the truck and ran into his house.

Defendant was a self-admitted member of the Krazy Crowd gang. Roman had the abbreviated name of a rival gang, "SSP," tattooed on the back of his head.

Macias was found shot dead at close range in the truck. On the truck there were bullet strikes on the back, driver's side rear, rear window toward the middle and right front passenger side, and front windshield. There were also bullet strikes on the front door of Roman's house, on the front porch, and on a chair on the porch. Law enforcement officers found shell casings at the rear of the truck, and in a grassy area on the driver's side of the truck. A law enforcement officer found a scooter at the house where the party had been.

Law enforcement officers later interviewed Piste-Naal, Gomez, and Luis. Piste-Naal described the person he had seen as "Latin," "robust" or of medium build, between 20 and 22 years old, and around 1.65 meters tall. Piste-Naal said the man was wearing dark clothing and a hooded jacket. Gomez described the man as "Latin," between 22 and 25 years old,[3] around five-seven to five-eight in height, around 190 pounds, with short hair, and he was wearing a dark pair of pants, a cap, and a dark sweater with a hood. Luis

---

**3**    At the preliminary hearing, Gomez testified he told police the man he saw was around 25 or 30 years old.

3

told police the shooter was around six feet tall and 200 pounds, wearing a black shirt and light-colored cargo shorts.

In May 2011, Piste-Naal, Gomez, and Luis identified defendant's picture from a six-pack photographic lineup. Gomez noted the picture of defendant looked like the man from the night of the shooting, except that night he did not have a mustache. Luis also noted defendant did not have a mustache on the night of the shooting. Piste-Naal and Gomez both identified defendant again at a preliminary hearing, and at trial. Luis identified defendant at trial. At trial, Luis testified defendant was not wearing a "hoodie" on the night of the shooting.[4]

The scooter was swabbed for DNA. A partial DNA profile was generated from the sample taken from the handlebars of the scooter and compared with a sample of defendant's DNA. A Los Angeles County Sheriff's Department criminalist concluded defendant was a possible source of the DNA found on the scooter. The criminalist further concluded "[t]he random max probability estimate of this profile is one out of 18 million," with 18 million representing: "[S]tatistically if I gather up a group of 18 million people, at most there could be another person unrelated to [defendant] who can also have contributed to this profile."

At trial, defendant offered expert testimony regarding the DNA evidence. The defense expert opined the DNA sample used by the prosecution was insufficient to reach any meaningful results. She concluded there was not enough data available to "even begin to make a decision about whether someone is excluded or included" as a possible source of the DNA swabbed from the scooter.

---

[4] At trial, Gomez and Luis testified they did not see any facial tattoos on the man they saw on the night of the shooting. Defendant has a facial tattoo. A homicide detective involved in the case testified that when he first spoke to defendant in June 2011 he did not notice any facial tattoos; the tattoo was very faint. However, by the time of the preliminary hearing the tattoo was much darker and noticeable.

The jury found defendant guilty of one count of murder and one count of attempted murder. As to both counts, the jury also found true the allegation that defendant personally used a firearm within the meaning of section 12022.53, subdivision (b), he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c), and he personally and intentionally discharged a firearm which caused death to Macias within the meaning of section 12022.53, subdivision (d). The jury further found true gang enhancements on both counts. (§ 186.22, subd. (b)(1)(C).) The trial court sentenced defendant to a total prison term of 90 years to life.

## DISCUSSION

### I.     No Reversible Error With Respect to Defendant's Admissions

Before defendant was charged with the crimes at issue in this case, but while he was being held on another charge, police orchestrated an undercover operation to elicit incriminating statements from him. Defendant made numerous inculpatory statements to two undercover police officers who were posing as fellow inmates who had committed crimes. The trial court denied defendant's pre-trial motion to suppress the statements. On appeal, defendant contends the undercover operation, and the subsequent admission of his statements into evidence, violated his rights under the Fifth Amendment. He further contends the police methods employed violated his right to due process and produced involuntary admissions that should have been excluded. We find no reversible error.

### A. Background: The Undercover Operation

In June 2011, homicide detectives with the Sheriff's Department organized an undercover operation to investigate defendant's involvement in the April 30 shootings. Defendant was in custody on an unrelated matter. On June 9, two homicide detectives met with defendant and advised him of his *Miranda* rights.[5] Defendant admitted he was a member of the Krazy Crowd gang. When the detectives said they wanted to talk about

---

[5]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

5

a murder that had occurred on Eastwood Avenue, defendant refused to talk with them further.

On June 11, defendant was placed in a holding cell with two undercover deputy sheriffs. After a little over an hour, the detectives had defendant escorted to an office where they were waiting. As soon as defendant arrived at the office, "he wanted to turn around and walk away." The two detectives told him murder charges would be filed against him. They had "a conversation with [defendant] earlier about *Miranda*," and they asked if he wanted to speak with them. One detective said: "If you want to talk to us, I'll Mirandize you," but defendant walked away. He said he wanted nothing to do with the detectives. As one of the detectives began showing defendant photographs related to the crime, defendant again said he wanted nothing to do with the detectives and walked away. Defendant said he wanted to talk to his lawyer.[6]

---

[6]    A portion of this discussion was recorded. It included the following colloquy:
"[Detective]: What do you think [defendant]? Want to look at the photos again?
[Defendant]:  I want to speak to my lawyer.
[Detective]:  There's the man you killed right here. You shot him.
[Defendant]:  I want to speak to my lawyer.
[Detective]: C'mon man.
[Defendant]: I don't know what you're talking about.
[Second Detective]: That's cool with your lawyer.
[Detective]: What about Lil Man?
[Defendant]:  I got nothing to say to you.
[Detective]:  What about your fingerprints on the scooter?
[Defendant]:  I don't know what you're talking about.
[Detective]: Want to see the scooter?
[Defendant]:  I don't know what you're talking about?
[Detective]: How about the crime scene? It's got your DNA all over it.
[Defendant: I don't know what you're talking about.
[¶]
[Defendant]: I've got nothing to say.
[Detective]:  You've got nothing to say?
[Defendant]: I've got nothing to say to you."

6

In a process described as "stimulation," the detectives followed defendant back to the holding cell. They told defendant they knew he had committed the murder, and they were certain DNA evidence would reveal him to be the shooter. The detectives also asserted they had witnesses to the crime, they knew he had approached and shot the victim, they had his scooter and had DNA evidence from the scooter, and defendant had missed "Little Man." During this brief exchange, the detectives yelled at defendant and said he would be arrested for murder. The point was to "amp him up to get him . . . stimulated and whatever it would take just to give him enough information so that he would think that we really did have him and to get him wound up when he was placed back in the cell with the two undercover deputies."[7]

Defendant was returned to the holding cell with the two undercover deputy sheriffs. Over the next approximately two and a half hours, the undercover officers engaged defendant in conversation. Defendant made a number of incriminating statements, as well as denials that he was involved in the murder.[8] The undercover officers commiserated with defendant, gave him advice such as not to tell the police anything or get caught "slipping", and suggested strategies defendant might adopt to fight the murder charge, such as, "Okay, so earlier that day, you dropped that scooter, right? So they can't – they can't get you on that bullshit, you know . . . I mean, you could've given that scooter to a homie." In this manner they also asked defendant about the details of the murder.

---

[7]     One of the detectives testified he understood that after defendant said he wanted an attorney, no statements he made to the detectives after that point could be used against him. However, the idea was to get defendant in a "position where he wants to talk about it," and to give the undercover deputies something to talk about with defendant. The detective testified the "stimulation" portion of the encounter lasted under four minutes.

[8]     The conversation also included topics such as defendant's girlfriend, his son, his brother, and his tattoos. At times, defendant sang, rapped, and cried.

In response to one officer's question, defendant said the scooter was his. He indicated with gestures that during the shooting he wore a sweatshirt or jacket covering his arms. Defendant said he had the chance to go to Mexico after the murder, but did not because he "lagged it." One of the officers said he heard the detectives discussing the case; he told defendant the detectives said they had a witness who saw defendant cross the street and shoot at the victims. He asked if defendant's head was covered during the shooting:

> "[Deputy Castro]: Was your head covered when you fucking –
> [¶]
> [Defendant]: A hat.
> [Deputy Castro]: You had a hat on?
> [Defendant]: Yeah.
> [Deputy Castro]: Damn, homie. Fuck, I don't know, homie.
> [Defendant]: It looks bad, huh?"

Although defendant expressed concern that the conversation might be recorded, he continued talking with the officers after they dismissed the idea:

> "[Deputy Castro]: You can't remember anything, anybody that might've been around, you know? You didn't fucking look or anything?
> [Defendant]: Yeah, I don't like saying about this shit, we could be recorded, fool.
> [Defendant Navarro]: No, I talked that shit right there, dawg.
> [Defendant Castro]: I've been here many a times, homie, and fucking talked the shit.
> [¶] . . . [¶]
> [Defendant]: That's who's saying I missed – I missed—That's who's trying to tell me I missed Little Man.
> [Deputy Castro]: Did you fucking miss him, though?
> [Defendant]: Yeah, I missed Little Man. . . ."

Defendant said he got rid of his clothes from the night of the shooting. When asked if he had a "beef" with the victim, defendant said: "No, fool, just it is what it is, fool, gang banging shit, dawg." When asked what happened so that defendant did not shoot Ramon, defendant answered, "I ran out," and demonstrated walking backwards with a gun while pulling the trigger. When one of the officers said defendant made a mistake by missing Ramon, defendant said he believed Ramon was the person "snitching the homie off." An officer asked if Ramon had seen defendant's face. Defendant

8

answered: "I know that fool, he knows me, fool . . . . Like, where my mom lives, he lives on around the corner fool.  Like . . . he knows me, fool, like he knows – he knows me well, fool . . . That fool's a gangster, fool, I'm surprised if . . . it's him saying it was me, I'm surprised why.  I don't know, I wasn't even there."

During the conversation, defendant said he would tell his lawyer to at least try to get him a deal that would allow the possibility of parole.  Defendant suggested he would take a deal of 30 or 40 years.  After admitting that he was "stressing," and thinking about his son, defendant said, "I wish I never went down that block, man."  He explained his son might grow up without him and: "I lost my family over gangbanging, Holmes."

One of the officers asked if this was defendant's first "beta," or murder. Defendant replied, "Like, the first fucking case I caught."   The officer asked, "Yeah, but this is the first one you've done though?"  Defendant answered: "Yeah, fool."  When asked if defendant "got rid of his [shit]" following the incident, defendant responded by gesturing that he threw the gun away.  The officer replied, "That's the most important part, you got rid of your shit.  What bus did you take right there?"  Defendant gave the bus number and described how he went to a friend's house, got high, and fell asleep.

At one point, another deputy sheriff who was not undercover, Torres, approached the holding cell.  Torres summoned defendant, then said: "They're finishing up doing the whole add charge on you. . . . You're fucked, you know that?  They got fucking witnesses on you, they got a bunch of shit on you.  You're fucking yourself, all right? . . .  I don't give a fuck.  I don't know you, I don't care about you, but you're fucked, all right? . . . . They got a fucking case on you, I'm just giving you a head's up."  Defendant asked what the detectives had, and whether they said they had a witness.  Torres answered: "They have witnesses and they have your DNA."  Torres further said the witnesses saw defendant drop the scooter.  Defendant responded, "Well, no, they just put – that's why they got to prove the DNA."  Torres said, "What are you going to do, there's fucking witnesses.  Do you know how this works?"  Defendant responded, "yeah," then added, "That shit don't mean shit, though, dawg, they got to –" Torres interrupted: "Okay, if that's how you think it works, then you're—you're in for a fucking rude awakening,

9

buddy.  They saw you, they saw you fucking walk off, they saw you with the fucking pistol in your pocket, you're fucked."

Sometime later, Torres returned to escort defendant to his housing facility. Defendant asked if Torres would relay a message to the homicide detectives that he would take a deal of "40 years and two strikes."

**B.  Motion to Exclude**

Before trial, defendant moved to exclude his statements to the undercover officers. Defendant argued the police tactics violated his Sixth Amendment right to counsel and his Fifth Amendment rights.  The trial court denied the motion.  Defendant also moved to exclude his statement to Torres offering to plead guilty to 40 years and two strikes. Defendant argued the statement would be cumulative and unduly prejudicial.  The court denied the motion, finding that under Evidence Code section 352, the statement was highly probative and not unduly prejudicial.

**C.  Analysis**

As we understand defendant's argument, defendant asserts  his recorded statements should have been excluded because after the two detectives began an interrogation and defendant asserted his right to have counsel present, the undercover officers continued the custodial interrogation, in violation of defendant's rights under the Fifth Amendment.  Under United States Supreme Court and California Supreme Court precedent, we must reject this argument.

**i.  Applicable Legal Principles**

"In reviewing the trial court's denial of a suppression motion on *Miranda– Edwards* grounds,[**9**] 'it is well established that we accept the trial court's resolution of

---

**9**     *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*).  In *Edwards*, the court held that once an accused invokes the right to have counsel present during custodial interrogation, "a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights."  (*Id.* at p. 484, fn. omitted.)  The court further held that "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him,

10

disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' [Citation.] To the extent mixed questions of fact and law are present, they are reviewed de novo if predominantly legal and for substantial evidence if predominantly factual." (*People v. Gamache* (2010) 48 Cal.4th 347, 385.) Here, the historical facts were not disputed. Thus we independently review the trial court's ruling that defendant's recorded statements were not illegally obtained.

"To protect the constitutional privilege against self-incrimination, the *Miranda* rule requires that before the police may question the defendant during a custodial interrogation, the defendant must be advised of the right to remain silent and to an attorney and that any statements made may be used against him or her in court. [Citation.] If the defendant invokes the right to silence or to an attorney, the interrogation must cease. [Citation.] [¶] Generally, statements elicited in violation of these *Miranda* principles may not be used against the defendant at trial. . . . This exclusionary rule is applied in prophylactic fashion to deter coercive investigative questioning and advance the trustworthiness of trial evidence, even if the defendant's statements were voluntary apart from the *Miranda* violation." (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 86 (*Andreasen*); *Edwards, supra,* 451 U.S. at pp. 482, 485.)

However, "[t]he prophylactic *Miranda* protections are triggered only if a defendant is subjected to a custodial interrogation." (*Andreasen*, at p. 86.) "Interrogation . . . . refers to questioning initiated by the police or its functional equivalent, not voluntary conversation. [Citation.] ' "Volunteered statements of any kind are not barred by the Fifth Amendment . . . ." ' [Citations.] The 'functional equivalent' to express questioning involves police-initiated deceptive techniques designed to persuade or coerce a criminal defendant into making inculpatory statements.

unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485.)

11

[Citation.] The determination of whether an action is reasonably likely to elicit an incriminating response focuses primarily on the perceptions of the suspect, rather than the intent of the police. [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 432, citing *Rhode Island v. Innis* (1980) 446 U.S. 291, 299-301 (*Innis*) and *Miranda, supra,* 384 U.S. at p. 478.)

Since the focus of this analysis is on the perceptions of the defendant, courts have concluded a defendant's conversation with someone the defendant does not know is a government agent is not custodial interrogation for purposes of *Miranda*. Thus, in *Illinois v. Perkins* (1990) 496 U.S. 292, 296-300 (*Perkins*), the Supreme Court concluded *Miranda* warnings were not required when the police placed the defendant in a cell with an undercover agent who then elicited incriminating statements from the defendant.[10] The court explained: "The warning mandated by *Miranda* was meant to preserve the privilege during 'incommunicado interrogation of individuals in a police-dominated atmosphere.' [Citation.] . . . . [¶] Conversations between suspects and undercover agents do not implicate the concerns underlying *Miranda.* The essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone whom he believes to be a fellow inmate. Coercion is determined from the perspective of the suspect. [Citations.] When a suspect considers himself in the company of cellmates and not officers, the coercive atmosphere is lacking." (*Perkins,* at p. 296; *People v. Davis* (2005) 36 Cal.4th 510, 554 (*Davis*).)

---

**10** In *Perkins*, police wished to investigate the claims of an inmate (informant) that the defendant had admitted committing a previously unsolved murder. Police tracked the defendant to a jail where he was being held on a battery charge; they arranged to have him placed in a cellblock with an undercover agent and the informant. While pretending to plan an escape with the defendant and the informant, the undercover agent asked the defendant if he had ever killed anyone. The defendant said he had and described the murder at length. The undercover agent did not give the defendant *Miranda* warnings before the conversations. (*Perkins*, at pp. 294-295.)

12

*Perkins* is consistent with the conclusion of our high court in *People v. Williams* (1988) 44 Cal.3d 1127, that *Miranda* "has never been applied to conversations between an inmate and an undercover agent. This is because *Miranda* warnings serve to dispel the coercive effect of *police custodial* questioning. Both adjectives are crucial: *Miranda* does not apply to noncustodial police interrogation or to nonpolice custodial interrogation. When a defendant talks to a fellow inmate, the coercive atmosphere of custodial police interrogation is absent." (*Williams*, at pp. 1141-1142.)

Since *Perkins*, the California Supreme Court and courts of appeal in this state have repeatedly concluded that even after a defendant has invoked his right to remain silent or to have the assistance of counsel, the defendant's subsequent statements to a person he does not know is an explicit or unwitting government agent—e.g., a relative or friend cooperating with police, or a fellow suspect who is knowingly or unknowingly being recorded by police—do not implicate *Miranda* because such statements are not the product of "custodial interrogation."

For example, in *People v. Thornton, supra,* 41 Cal.4th at pages 432-433, after the defendant invoked his *Miranda* rights, police arranged a conversation between the defendant and his grandmother; the defendant voluntarily engaged in conversation with her. Police recorded the conversation with the grandmother's knowledge. The reviewing court found the conversation was not interrogation or its functional equivalent, thus there was no Fifth Amendment violation. In *Davis,* after the defendant invoked his *Miranda* rights, police recorded a conversation between the defendant and his cellmates in which he made incriminating statements. The reviewing court explained that when the situation was viewed from the defendant's perspective, when he made statements to his cellmates there was "no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak." (*Davis, supra,* 36 Cal.4th at pp. 553-555.) As a result, admission of the incriminating statements did not violate his rights under *Miranda.* (See also *People v. Jefferson* (2008) 158 Cal.App.4th 830, 840-841 [after defendants invoked their *Miranda* rights police placed them in a cell and recorded their conversation; no *Miranda* violation because there was no interrogation].) In *People v. Mayfield* (1997)

13

14 Cal.4th 668, 757-758, after the defendant invoked his *Miranda* rights and requested an attorney, he asked to speak with his father. Police recorded the conversation and also asked the father to repeat what the defendant had said. The reviewing court concluded the statements the defendant made to the father were not the product of custodial interrogation.

In *People v. Plyler* (1993) 18 Cal.App.4th 535, after the defendant asserted his right to counsel, police orchestrated a call by the defendant to one of his victims, with the victim's knowledge and cooperation. The appellate court concluded the defendant's recorded statements to the victim were not the product of police custodial interrogation. The court reasoned that even if the defendant had been coerced into placing the call, "he did not know [the victim] was working with the police. Under *Perkins*, absent such knowledge there is no reason to assume he might feel coerced and no Fifth Amendment violation occurred." (*Id.* at pp. 544-545, fn. omitted.)

Similarly, in *People v. Guilmette* (1991) 1 Cal.App.4th 1534, 1538-1542, after the defendant invoked his *Miranda* rights, police recorded the defendant's telephone calls to the victim, with the victim's cooperation. During the calls the victim asked the defendant questions suggested by police; the defendant also volunteered statements and answered the victim's independent questions. The court found there was no *Miranda* violation because there was no custodial police interrogation. Although it was conceded that the victim was acting as a government agent, the court noted the defendant initiated the telephone contact, sought out the conversation, and was not forced to speak with the victim. The court explained: "Since appellant was not forced to contact the victim and since he did not know that [the victim] was acting as a police agent, there was no 'police-dominated atmosphere' [citation], there were no 'inherently compelling pressures' [citation], and there was no 'coercive atmosphere' [citation]." (*Id.* at p. 1540.) The court further rejected the argument that the defendant's prior invocation of his rights changed the analysis. In the absence of custodial interrogation, the court reasoned "the fact that the conversation occurred after an invocation of rights is without legal significance." (*Id.* at p. 1541.) (See also *People v. Gonzales and Solis* (2011) 52 Cal.4th 254, 272-273,

14

283-284 [no custodial interrogation where fellow inmate and gang member wore a wire and discussed crimes with defendant; no *Miranda* warnings were required]; *People v. Tate* (2010) 49 Cal.4th 635, 681, 685-687 [in the midst of a custodial interrogation (after defendant waived *Miranda* rights), defendant's girlfriend asked to speak with him then reported to police what he said; police were not required to provide new *Miranda* warnings before the conversation with the girlfriend; even in the process of a custodial interrogation, a voluntary statement to someone the suspect does not believe is a police officer or agent does not involve the coercive atmosphere of police questioning in custody].)

### ii. Discussion

At the outset, we acknowledge the seeming incongruity of finding admissible incriminating statements secured when the police initiate a custodial interrogation, the defendant unequivocally invokes the right to remain silent and the right to counsel, then undercover police officers take up the interrogation, doing what their uniformed colleagues could not. However, while the parties have not cited, and our research has not uncovered, any case concerning the admissibility of statements elicited by undercover officers *after* the defendant has invoked the right to remain silent or the presence of an attorney, and remains in custody, the applicable legal principles are well developed. The above described authorities govern the result in this case.

As the California Supreme Court explained in *Davis*, after a defendant invokes his *Miranda* rights, police interrogation must cease, which means the police may not engage in conduct " 'reasonably likely' to elicit an incriminating response from the suspect." (*Davis, supra,* at p. 554.) To determine "whether police conduct [is] 'reasonably likely' to elicit an incriminating response from the suspect, we consider primarily the perceptions of the suspect rather than the intent of the police. [Citations.] Because the dual elements of a police-dominated atmosphere and compulsion are absent when the defendant is unaware that he is speaking to a law enforcement officer, however, *Miranda* is inapplicable when the defendant does not know that the person he is talking to is an

15

agent of the police." (*Ibid*, citing *Arizona v. Mauro* (1987) 481 U.S. 520, 527, *Innis, supra,* 446 U.S. at p. 301, and *Perkins, supra,* 496 U.S. at pp. 296-300.)

Here, as in *Perkins*, and as in cases such as *Davis,* defendant " 'consider[ed] himself in the company of cellmates and not officers,' and the coercive atmosphere of custodial interrogation was lacking. [Citation.] Viewing the situation from defendant's perspective (see *Arizona v. Mauro, supra,* 481 U.S. at p. 527; *Rhode Island v. Innis, supra,* 446 U.S. at p. 301), when he made these statements to his cellmates there was no longer a coercive, police-dominated atmosphere, and no official compulsion for him to speak." (*Davis*, *supra*, at p. 555.)

Defendant attempts to distinguish *Perkins* by asserting the detectives' "stimulation" technique, combined with the undercover officers' lengthy conversation with defendant, created a police-dominated atmosphere not present in *Perkins*.[11] We are not persuaded. Whatever defendant's motivation for conversing with the undercover officers, there was no "official compulsion" for him to speak to them because he did not believe they were police officers. Defendant further misconstrues *Perkins* when he asserts the court "specifically found no 'interplay between police interrogation' and the jail cell atmosphere where the defendant made his incriminating statements." Instead, the *Perkins* "interplay" language concerned police interrogation and police custody, and the coercive effects when custody and official interrogation are combined. Thus, the court explained:

> "It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation. We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist. The state court here mistakenly assumed that because the suspect was in custody, no undercover questioning could take place. When the suspect has

---

[11] We note this is defendant's only argument to distinguish *Perkins.*

16

no reason to think that the listeners have official power over him, it should not be assumed that his words are motivated by the reaction he expects from his listeners. '[W]hen the agent carries neither badge nor gun and wears not "police blue," but the same prison gray' as the suspect, there is no '*interplay* between police interrogation and police custody.' [Citation.]

*Miranda* forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner. As we recognized in *Miranda:* '[C]onfessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.' [Citation.] Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." (*Perkins,* at p. 297.)

The undercover officers in this case were persistent and effective questioners. But there was no evidence they coerced defendant into speaking with them. He had no reason to believe they had any official power over him, nor did they threaten him in any way. It is not the aggressiveness of the "official" police conduct in this case that matters for *Miranda* purposes, rather it is what compelled defendant to inculpate himself in conversations with the undercover officers. With respect to the presence or absence of "coercion" within the meaning of *Miranda*, we find no basis to distinguish this case from *Perkins.*

Moreover, defendant does not distinguish or even address the California cases in which courts have applied *Perkins* and concluded that, despite circumstances in which the defendant may have been intimidated by official police questioning or the circumstances of being in custody, and in which police have taken advantage of such circumstances to secure defendant's incriminating statements to someone he does not believe to be a government agent, there is no *Miranda-Edwards* violation because of the absence of custodial interrogation. We conclude the trial court did not err in denying defendant's motion to exclude his recorded statements to undercover officers.

### D. Statements to Torres

Defendant additionally argues the court erred in admitting his statement to Torres that he would be willing to plead guilty in exchange for a sentence of 40 years and two

strikes. Defendant contends that under *Edwards*, Torres's statements to defendant were improper, and defendant's subsequent statements could not be used against him. We conclude defendant forfeited this argument by failing to raise it in the trial court and, even if admission of the statements was error, it was harmless beyond a reasonable doubt.

As explained above, after a defendant invokes his right to have the assistance of counsel, interrogation must cease. Thereafter, police may not engage in conduct " 'reasonably likely to elicit an incriminating response from the suspect.' " (*Davis, supra,* at p. 554.) Statements elicited in violation of this *Miranda* principle may not be used against the defendant at trial. (*Andreasen, supra,* 214 Cal.App.4th at p. 86.)

Yet, in this case, defendant did not object to the admission of his statements to Torres on the ground that they were elicited in violation of his Fifth Amendment rights. Defendant did not include the statements to Torres in his written motion to exclude or in his argument on the motion. Instead, he later argued only that the statements should be excluded under Evidence Code section 352 because they were cumulative and unduly prejudicial. This general evidentiary objection was not sufficient to preserve the Constitutional objection defendant now raises on appeal because it did not provide the trial court the "opportunity to resolve material factual disputes and make necessary factual findings." (*People v. Scott* (2011) 52 Cal.4th 452, 482.) The argument is waived.

Even had defendant preserved the argument, and even if admission of the statements was in error, it is apparent any error was harmless beyond a reasonable doubt. For reasons explained above, the trial court could properly admit defendant's recorded statements to the undercover officers. In the recording, defendant at least twice said he would be willing to accept a 30 or 40-year sentence. Thus, the admission of a similar statement to Torres, even if an error, did not contribute to defendant's conviction in light of the entire record, and was therefore harmless beyond a reasonable doubt. (*Davis, supra,* 36 Cal.4th at p. 555; *People v. Cunningham* (2001) 25 Cal.4th 926, 994.)

18

### E. No Due Process Violation

Finally, defendant contends his rights to due process were violated because the law enforcement tactics used in this case produced an involuntary confession that should have been excluded. We disagree.

As an initial matter, this argument is also forfeited. Defendant did not raise the alleged involuntariness of his statements as a basis for their exclusion. (*People v. Tully* (2012) 54 Cal.4th 952, 992.) But even had defendant raised this issue below, we would reject it.

" ' "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence. [Citation.] Although coercive police activity is a necessary predicate to establish an involuntary confession, it 'does not itself compel a finding that a resulting confession is involuntary.' [Citation.] The statement and the inducement must be causally linked. [Citation.]" [Citation].' [Citation.]" (*People v. Linton* (2013) 56 Cal.4th 1146, 1176.)

In this case, while the homicide detectives may have adopted aggressive, confrontational tactics, defendant made no admissions or confession to the detectives. (*People v. Dement* (2011) 53 Cal.4th 1, 28 [defendant could not be prejudiced by interrogation which, even if unlawful, produced no statements].) Defendant did make admissions to the undercover officers, sometimes in response to their friendly, but persistent questions, but there is no evidence those statements were obtained by express or implied threats, promises of leniency, or any other coercive behavior. (*Tate, supra,* 49 Cal.4th at p. 684 [use of deceptive statements during an interrogation does not render confession involuntary unless the deception is of a type reasonably likely to procure an untrue statement].) Indeed, defendant did not believe he was speaking to government agents, and he had no reason to believe the undercover deputies had any official power over him. (*People v. Atchley* (1959) 53 Cal.2d 160, 171 [defendant's recorded statements to insurance agent who was a former police officer, and was acting in concert with the police, were not involuntary].) Thus, there is no basis to conclude the recorded statements defendant made to the undercover officers were the result of his will being

19

overborne by police coercion. (*People v. Dykes* (2009) 46 Cal.4th 731, 752; *People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1173-1174 [no coercion rendering admissions involuntary where defendant thought he was talking to a friend and was unaware fellow suspect was secretly recording at behest of the police].)

Moreover, even if the homicide detectives' tactics could be deemed coercive, defendant's statements to the undercover officers were only indirectly related to the homicide detectives' questions or tactics.[12] "A confession is not rendered involuntary by coercive police activity that is not the 'motivating cause' of the defendant's confession. [Citation.]" (*Linton*, *supra,* 56 Cal.4th at p. 1176.) There is no evidence defendant's statements to the undercover officers were coerced by threats or false promises, rather than being given freely and voluntarily to people he believed were fellow suspects and gang members.

We therefore reject defendant's argument that the admission of the statements violated his right to due process.[13]

## II. Sufficient Evidence Supported the Jury's True Findings on the Gang Enhancements

### A. Background: *Gang Expert Testimony*

At trial, Hawthorne Police Detective Antonio Robles testified as a gang expert. Robles's experience as a gang expert included 40 hours of training at the Los Angeles

---

[12]     We note that the "stimulation," in which the detectives confronted defendant with evidence of the crime and asserted he was guilty, lasted only a brief period, and consisted mainly of their presentation of evidence to defendant and assertions he was guilty. " ' "The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." ' [Citation.]" (*People v. Williams* (2010) 49 Cal.4th 405, 443.)

[13]     Defendant's only argument under the Fourteenth Amendment concerns involuntariness due to his will being overborne. He does not assert any other due process argument relating to the use of undercover police officer questioning after an invocation of the right to the assistance of counsel.

County Sheriff's Academy; three years investigating crimes involving gang members and gang assaults at the Men's Central Jail and interviewing inmates about specific gang tattoos, graffiti, and crimes; training within the City of Hawthorne Police Department about gangs specific to the city and environs; and regular trainings regarding gang and gang-crime related issues. In his 10 years at the Hawthorne Police Department, Robles had worked assignments with a gang enforcement team and conducted investigations regarding juvenile gang members. At the time of trial he was a gang intelligence detective for the department and a member of the South Bay Gang task force. He had testified as a gang expert 20 times.

Robles testified that defendant was a self-admitted member of the Krazy Crowd gang. Robles was familiar with the Krazy Crowd gang due to his personal contacts with members of the gang and discussions with gang members about the gang, including their current "wars or enemies." Robles had also investigated and assisted in investigating crimes committed by or against Krazy Crowd members. He had reviewed police reports, field interview cards, and photographs of Krazy Crowd gang members. Robles testified the gang had been in existence between 10 and 15 years, and he described the territory claimed by the gang. According to Robles, the gang has approximately 50 to 60 members; he described their common hand signs, and the abbreviations members use in tagging and tattoos.

Robles opined "the primary crimes or activities of Krazy Crowd range from . . . gang vandalism to assaults, robberies, weapons possessions, narcotics violations, shootings, attempted murders." He identified two crimes committed by individuals he opined were Krazy Crowd gang members: a robbery in August 2007 and an unlawful possession of a firearm in December 2008. On cross-examination, Robles testified he could not recall if any "documented [Krazy Crowd] members" had been convicted of murder.

Robles testified that one of the Krazy Crowd gang's rivals is Tepa 13, referred to by its enemies as "Tripas." He also testified that the Southside Players gang was a primary enemy gang of Krazy Crowd; some members used "SSP" as a tattoo.[14] When presented with a hypothetical mirroring the facts of the case, Robles opined the murder and attempted murder were committed to benefit the Krazy Crowd gang.

**B. Discussion**

On appeal, defendant contends the evidence did not establish the Krazy Crowd gang is a "criminal street gang," in that 1) there was insufficient evidence that the gang's members have engaged in a pattern of criminal gang activity; and 2) there was insufficient evidence that one of the gang's primary activities is a crime enumerated in the gang enhancement statute. We disagree.

"In determining whether the evidence is sufficient to support a conviction or an enhancement, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] . . . . This standard applies to a claim of insufficiency of the evidence to support a gang enhancement. [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224 (*Vy*).)

**i. Gang Enhancement Statute**

Section 186.22, subdivision (b)(1), provides for an enhanced sentence for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members[.]"

Subdivision (f) defines "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a

---

[14] As noted above, at trial it was established that Francisco Roman, the attempted murder victim, had "SSP" tattooed on the back of his head.

common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).)

Subdivision (e) defines "pattern of criminal gang activity" as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons . . . ." (§ 186.22, subd. (e).)

The subdivision sets forth 33 enumerated crimes. The list includes assault with a deadly weapon or by means of force likely to produce great bodily injury (§ 186.22, subd. (e)(1); § 245); robbery (§ 186.22, subd. (e)(2); § 211, et seq.); unlawful homicide (§ 186.22, subd. (e)(3); § 187, et seq.); the sale, possession for sale, transportation, manufacture, offer for sale, or offer to manufacture controlled substances (§ 186.22, subd. (e)(4); Health & Saf. Code, §§ 11054-11058); certain types of shootings (§ 186.22, subd. (e)(5)-(6); §§ 246, 12034, subds. (a) & (b)); felony vandalism (§ 186.22, subd. (e)(20); § 594, subd. (b)(1)); and certain firearm possession crimes (§ 186.22, subds. (e)(23) & (31); §§ 12101, subd. (a)(1), 29610, 12021, 29800, et seq.).

Thus, among other things, to establish the applicability of a gang enhancement, the People must prove the alleged gang is an organization of persons that has engaged in one or more of the enumerated crimes as a "primary activity." The People must also show that the group's members have engaged in a pattern of criminal gang activity by showing the commission, attempted commission, or conviction of two or more enumerated crimes, within the specified time period, that were either committed on separate occasions, or by two or more persons ("predicate offenses").

### ii. Pattern of Criminal Gang Activity

Defendant asserts the People did not establish a pattern of criminal gang activity. Although the People offered evidence that two Krazy Crowd gang members committed enumerated crimes in 2007 and 2008, defendant contends this was insufficient to show a

23

"pattern of criminal gang activity" because there was no evidence the defendants were gang members at the time the crimes were committed, or that the crimes were gang-related crimes.

However, as defendant acknowledges, this argument was considered and rejected in *People v. Augborne* (2002) 104 Cal.App.4th 362 (*Augborne*). Although defendant urges us to disagree with *Augborne*, we find its reasoning persuasive. As in this case, the defendant in *Augborne* argued that "in order for the section 186.22 enhancement to apply, the persons perpetrating the predicate offenses must be gang members when the crimes were committed." (*Id.* at p. 366.) Although the prosecutor offered expert testimony establishing the predicate offenses, there was no evidence that the persons committing the crimes were gang members at the time the crimes were committed. (*Id.* at p. 370.) The *Augborne* court analyzed section 186.22 to resolve the defendant's claim. Employing the usual rules of statutory interpretation, the court explained that section 186.22 is unambiguous. "[N]one of the elements of the gang enhancement statute require the two or more persons committing the two predicate crimes be gang members *at the time* the offenses were committed. Defendant's legal contention that the two section 186.22, subdivision (e) predicate crimes had to be committed by two persons *when* they were gang members requires we add an additional element to section 186.22, something we are prohibited from doing." (*Id.* at p. 375.)

The court was further guided by the California Supreme Court's analysis in *People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*). In *Gardeley*, the court considered whether "the prosecution must establish not only the requirements for predicate offenses set forth in the statute, but also that each such offense was committed *for the benefit of, at the direction of, or in association with the gang.*" (*Id.* at p. 621.) The court analyzed the statutory language, which it found was clear and unambiguous, and concluded nothing in the language of the statute suggested the Legislature intended to require "the 'two or more' predicate offenses to have been committed 'for the benefit of, at the direction of, or in association with' the gang." (*Ibid.*) The court further noted the Legislature made clear that crimes are only subject to increased punishment if they are "gang related" by

24

including the "for the benefit of, at the direction of, or in association with" language in section 186.22, subdivision (b)(1). The Legislature did not include similar language in section 186.22, subdivision (e) describing the predicate offenses. This omission supported the conclusion that the Legislature did not intend that predicate offenses must be "gang related." (*Id.* at pp. 621-622.)

Thus, the *Augborne* court reasoned: "*Gardeley* holds that predicate offenses need not have been committed for the benefit of, at the direction of, or in association with the gang. It reasonably follows then that the prosecutor need not demonstrate that the two or more individuals who committed the predicate crimes were gang members *at the time* the offenses were committed." (*Augborne,* at p. 375.)

Defendant contends *Augborne* is incorrectly decided because the court's reasoning ignores the statute's use of the term "pattern of criminal *gang* activity." Defendant asserts the use of "gang" indicates that crimes can only qualify as predicate offenses if there is evidence they were committed by persons who were gang members at the time the crimes were committed. However we agree with the *Augborne* court that this interpretation requires the addition of words to the otherwise clear language of the statute. The statute itself defines "pattern of criminal gang activity." The definition is "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the" enumerated offenses, within the specified time period, "and the offenses were committed on separate occasions, or by two or more persons." We decline to add language to the statute when the Legislature did not see fit to do so. The People were not required to establish the Krazy Crowd gang members who committed the predicate offenses were gang members at the time the offenses were committed.

**iii.  CALCRIM No. 1403 did not prevent the jury from considering the evidence offered to determine whether the People established the "pattern of criminal gang activity" element**

Defendant further contends the standard instruction limiting the jury's use of gang evidence prevented it from having substantial evidence upon which to find a "pattern of criminal gang activity."  We find no merit in this argument.

As described above, the People offered the testimony of a gang expert, Robles, at trial.  Robles described the Krazy Crowd gang, its history, the gang's activities, its territory and membership, and two predicate offenses.  Evidence regarding gangs also came in through the recording of defendant's conversation with the undercover officers, and other witnesses in relation to the charged crimes.  The trial court instructed the jury with CALCRIM No. 1403, which as given in this case, provided: "You may consider evidence of gang activity only for the limited purpose of deciding whether: The defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes; or, the defendant had a motive to commit the crimes charged. You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion.  You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crimes."

Defendant does not argue the jury should not have been able to consider the gang evidence in determining whether the People established a pattern of criminal gang activity with respect to the gang allegation.  Thus, as we understand his argument, defendant contends the instruction misdirected the jury, thereby ensuring the jury's true finding on the gang allegation was based on insufficient evidence.

We note that the standard instruction prompts the court to instruct the jury that it may consider evidence of gang activity for the limited purpose of deciding whether "the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related ([crime[s]/ [and] enhancement[s]/ [and] special circumstance allegations)

26

charged." (CALCRIM No. 1403.) In this case, it may have been more accurate for the trial court to include "enhancements" in the instruction. However, when reviewing a purportedly erroneous instruction, our concern is whether, taking all of the instructions together, it is reasonably likely the court's modifications confused the jury or caused it to misconstrue or misapply the law. (*People v. Thornton, supra,* 41 Cal.4th at p. 436; *People v. Snow* (2003) 30 Cal.4th 43, 97.)

It is not reasonably likely that the court's rendition of CALCRIM No. 1403 confused the jury or caused it to misapply the instruction. The court instructed the jury at length regarding the gang enhancement and the elements necessary for a true finding. We have no doubt the jury understood it was to consider the gang evidence offered to make a determination on the enhancement, as well as the underlying crimes charged. Although the instruction referred only to the "gang-related crimes," rather than the crimes *and* the gang allegation, it is not reasonably likely that the jury construed the instruction as forbidding them from considering the gang evidence obviously introduced to prove up the gang allegation. We reject defendant's argument.

**iv. The gang expert's testimony provided sufficient evidence for the jury to conclude the Krazy Crowd gang engaged in an enumerated offense as one of its primary activities**

**1. "Primary" Activities**

Defendant argues Robles's testimony regarding the Krazy Crowd gang's "primary activities" was insufficient for the jury to find the gang allegation true because there was no evidence of the gang's other activities. We disagree. Several courts have concluded an expert's opinion, properly supported by personal investigation and knowledge, may be sufficient to establish that one of a gang's primary activities is the commission of one of the enumerated crimes. (See *Gardeley, supra,* 14 Cal.4th at pp. 619-620; *Vy, supra,* 122 Cal.App.4th at p. 1226; *People v. Duran* (2002) 97 Cal.App.4th 1448, 1465-1466.) An expert may properly opine regarding a gang's primary activities. Encompassed in such an opinion, and the use of the word "primary," is the expert's view that the activity described is indeed a chief or principal occupation of the gang. (*People v. Sengpadychith*

27

(2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) So long as the opinion is reasonable, which is to say supported by an adequate foundation of personal knowledge or other reliable information, the People need not also offer evidence of the gang's other, non-primary activities, requiring the jury to itself conduct a comparative analysis to decide whether an activity is primary.

Indeed, in *Sengpadychith,* the court explained: "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony, as occurred in *Gardeley, supra,* 14 Cal.4th 605." (*Sengpadychith, supra*, at p. 324.) While the People could have attempted to prove the Krazy Crowd gang's primary activities by offering evidence of all of its activities and their frequency so as to allow the jury to determine for itself whether the gang committed one or more of the enumerated offenses as its primary activities, it was equally sufficient for the People to offer an expert opinion on the issue. (*People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.) Here, Robles's opinion was based on his personal contacts with members of the gang, discussions with gang members regarding the gang, his personal investigation of  crimes committed by or against Krazy Crowd members, and his personal review of police reports regarding Krazy Crowd gang members. He had training and experience as a gang expert. The jury could reasonably credit Robles's opinion, based on his expertise, that the Krazy Crowd gang's primary activities included some of the enumerated offenses. Substantial evidence supported the jury's finding that the Krazy Crowd gang's primary activities included statutorily enumerated criminal offenses.

## 2.  Gang-related

Defendant next contends that, in addition to establishing the Krazy Crowd gang has as one of its primary activities one or more of the statutorily enumerated crimes, the prosecution was also required to prove these crimes are or have been gang-related. We reject this argument because the statute contains no such requirement. The "primary activities" element is one part of what the People must prove to establish the gang at issue is a "criminal street gang." As set forth in the statute and explained above, "the 'criminal

28

street gang' component of a gang enhancement requires proof of three essential elements: (1) that there be an 'ongoing' association involving three or more participants, having a 'common name or common identifying sign or symbol'; (2) that the group has as one of its 'primary activities' the commission of one or more specified crimes; and (3) the group's members either separately or as a group 'have engaged in a pattern of criminal gang activity.' [(*Gardeley, supra,* 14 Cal.4th at p. 617.)]" (*Vy, supra,* 122 Cal.App.4th at p. 1222.) Under the plain language of the statute there is no additional requirement that the People show the group has as one of its primary activities the "gang-related" commission of one or more of the enumerated crimes. The Legislature has decided how to define "criminal street gang" in the gang enhancement statute. We decline to read into the statute additional terms the Legislature could have included, but did not. (*Gardeley*, at pp. 621-622.)

### 3. Not improperly conclusory or overbroad

Finally, defendant contends Robles's testimony was insufficient to support the "primary activities" finding because it was conclusory, not specific, and overbroad.

In support of the assertion that Robles's testimony was conclusory and not specific, defendant relies on *In re Alexander L.* (2007) 149 Cal.App.4th 605 (*Alexander L.*). However, *Alexander L.* is distinguishable and provides a helpful contrast. In *Alexander L.*, the only evidence offered in support of the "primary activities" element was the testimony of a gang expert. The expert, a deputy sheriff who had apprehended the minor in the crime charged, indicated he "knew" the gang had "committed quite a few assaults with a deadly weapon, several assaults," and he "knew" the gang had been involved in murders, auto thefts, auto burglaries, felony graffiti, and narcotic violations. (*Id.* at p. 611.) "No specifics were elicited as to the circumstances of these crimes, or where, when, or how [the deputy] obtained the information. He did not directly testify that criminal activities constituted [the gang's] primary activities. Indeed, on cross-examination, [the deputy] testified that the vast majority of cases connected to [the gang] that he had run across were graffiti related." (*Id.* at pp. 611-612, fn. omitted.)

29

The *Alexander L.* court found this evidence was insufficient to establish the "primary activities" portion of the enhancement. The court recognized that while expert testimony may be sufficient evidence to support a primary activities finding, in the case before it the expert's testimony lacked adequate foundation. There was no evidence regarding the basis of the expert's testimony. It was thus impossible "to tell whether his claimed knowledge of the gang's activities might have been based on highly reliable sources, such as court records of convictions, or entirely unreliable hearsay." (*Alexander L., supra,* at p. 612, fn. omitted.) Without an adequate foundation, the testimony was not substantial evidence of the gang's primary activities.

In contrast, here there was significant evidence regarding the foundation for Robles's opinion. He testified about his extensive training and experience as a gang expert. He further testified about his personal knowledge of the gang and his investigations involving Krazy Crowd gang members. He directly testified about the primary activities of the gang. This was not like the non-specific testimony at issue in *Alexander L.*, in which the expert simply indicated he "knew" that the gang had committed or been involved in some of the enumerated offenses. Instead, it was similar to the expert testimony in *Gardeley*, which our high court found sufficient to establish the primary activity of the gang at issue. (*Alexander L.*, at p. 613.) The reasoning and analysis of *Alexander L.* make clear that the expert testimony here was substantial evidence sufficient to support the jury's finding that the Krazy Crowd gang had as one of its primary activities one or more enumerated offenses. (*Martinez, supra,* 158 Cal.App.4th at p. 1330.)

Defendant additionally asserts Robles's testimony was "fatally overbroad" in that when describing the Krazy Crowd gang's primary activities, he listed some crimes of which only a subset are enumerated offenses. For example, Robles identified "assaults" as one of the Krazy Crowd gang's primary activities, yet section 186.22, subdivision (e)(1) identifies as an enumerated offense only assault with a deadly weapon or by means of force likely to produce great bodily injury.

We need not resolve this issue. To establish a "criminal street gang" for purposes of the enhancement, the People were only required to prove that the group has "as one of its primary activities the commission of one or more of the criminal acts enumerated" in specified paragraphs of the statute. (§ 186.22, subd. (f).) While some of the crimes Robles identified as the Krazy Crowd gang's primary activities were broader than the enumerated crimes, he also listed robberies and attempted murders. These are enumerated crimes under section 186.22, subdivisions (e)(2) and (e)(3). No more was required.

We have found sufficient evidence supported the jury's true finding on the gang allegation. Thus, we need not consider defendant's argument that the firearm enhancements could not be imposed absent a gang enhancement.

## DISPOSITION

The trial court judgment is affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.

31